**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Brett D. LEAVEY, | ) | No. CV-02-2281-PHX-SMM |
| Plaintiff, | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| v. | ) ) | |
| UNUM/PROVIDENT CORP., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

A jury trial was held in this case from September 13, 2005 to October 7, 2005. On October 7, 2005, the jury awarded Plaintiff $809,028.00 in future policy benefits, $4,000,000 in mental, emotional, and physical pain and suffering compensatory damages, and $15,000,000 in punitive damages. [Doc. No. 225]

Pending before the Court are Defendants' Renewed Motion for Judgment as a Matter of Law or, In the Alternative, Motion for a New Trial and/or Remittitur, filed October 27, 2005 [Doc. No. 235] and Plaintiff's Motion for Attorneys' Fees and Related Non-Taxable Expenses, filed October 24, 2005 [Doc. No. 231]. Plaintiff responded to Defendants' Motion on December 22, 2005 [Doc. No. 261], and Defendants filed a Reply on February 3, 2006 [Doc. No. 270]. Both sides filed Supplemental Authority regarding Defendants' Motion. [Doc. Nos. 271, 272] Defendants responded to Plaintiff's Motion on February 3, 2006 [Doc. No. 269], and Plaintiff replied on February 17, 2006 [Doc. No. 273]. Plaintiff has requested oral argument on both Motions, but the Court will deny those requests, as it would not be

significantly aided by oral argument.  After considering the arguments raised by the parties in their briefs, the Court issues the following Memorandum of Decision and Order.

## I. BACKGROUND

Plaintiff was a general dentist who purchased an "own occupation" disability insurance policy from Defendant Provident Life and Accident Insurance Company ("Provident"), a subsidiary of Defendant UNUM/Provident Corporation, on February 7, 1990.  In 1998, Plaintiff became "totally disabled" under the terms of the policy due to chemical dependency and was provided with a monthly cash benefit.  On December 4, 2001, after having conducted independent medical examinations of Plaintiff, Defendants sent Plaintiff a letter informing him, *inter alia*, "you do not qualify for continuing Total Disability benefits under the term of the policy."  On March 26, 2002, Plaintiff brought this bad faith suit against Defendants, claiming bad faith and seeking compensatory and punitive damages, as well as attorneys' fees and costs.  Defendants removed the case to this Court on November 13, 2002. [Doc. No. 1] Defendants maintained they did not act in bad faith and that, after receiving a statement from Plaintiff's treating physician confirming that Plaintiff was still disabled, Defendants resumed monthly payments on July 8, 2002, and has since continued to pay Plaintiff monthly.

## II.  RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW/ NEW TRIAL/REMITTITUR

Defendants renew their Motion for Judgment as a Matter of Law on the issues of bad faith and punitive damages.  Additionally, Defendants move this Court for a new trial on both bad faith and punitive damages and/or remittitur of the compensatory and punitive damages awards.  The Court addresses each portion of the Motion in turn.  In so doing, the Court will not exhaustively recount all the documentary evidence and testimony presented at the trial.  Instead, the Court will discuss the pertinent testimony and exhibits highlighted by the parties in support of their respective positions.

//

**A. Judgment as a Matter of Law**

   **1.** *Standard of Review*

   "Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1161 (9th Cir. 1997); see also White v. Ford Motor Co., 312 F.3d 998, 1010 (9th Cir. 2002). Thus, judgment as a matter of law may be granted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue...." FED. R. CIV. P. 50(a)(1); Juhnke v. EIG Corp., 444 F.2d 1323, 1325 (9th Cir. 1971) (noting that directed verdict and motion for judgment notwithstanding the verdict "are measured by the same standards as the latter is merely a renewal of the former").

   In considering a Motion for Judgment as a Matter of Law under Rule 50(b), "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). However, because the Court reviews the Record as a whole, the Court "should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Id. at 151 (citation and internal quotation marks omitted). Therefore, the Court's role is not to substitute its view of the evidence for that of the jury. Winarto v. Toshiba Am. Electronics Components, 274 F.3d 1276, 1283 (9th Cir. 2001). When two possible sets of inferences are supported by the Record, "the inferences that support the jury's verdict of course win the day." Id. at 1287.

   **2.** *Discussion*

      a. Bad faith

   At the close of the Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law ("JMOL") as to bad faith. (Trial Tr. 1420:16-18.) Defendants first argued that

1   Plaintiff had failed to show that Defendants acted unreasonably in their investigation,

2   evaluation, and processing of Plaintiff's claim.  (<u>Id.</u> at 1420:24-25 - 1421:19.)  Specifically,

3   Defendants contended that the evidence showed "that [Defendant] Provident Life had

4   legitimate concerns over whether [Plaintiff] was meeting the appropriate care requirement

5   of the contract, and whether issues of personal choice and motivation were affecting

6   [Plaintiff's] compliance with the appropriate care provision."  (<u>Id.</u> at 1421:9-15.)  Second,

7   Defendants argued that Plaintiff failed to prove that Defendants knew or were conscious of

8   the fact that their conduct was unreasonable: "there's no evidence that anyone handling this

9   claim acted with the required mental state, that is, that either Jennifer Conrad [Provident

10  claim representative] or Jeff Johnson [consultant to Ms. Conrad at Provident] acted knowing

11  that they were being unreasonable, or acted with reckless disregard of the fact that they had

12  no reasonable basis for their actions."  (<u>Id.</u> at 1421:22 - 1422:2.)

13      At the close of Defendants' case-in-chief, Plaintiff also moved for JMOL.  (<u>Id.</u> at

14  1944:9 - 1945:13.)  In response, Defendants repeated their assertion that they had legitimate

15  concerns about appropriate care and personal choice, and also contended that they did not

16  close Plaintiff's claim. (<u>Id.</u> at 1945:21 - 1947:21.)  Defendants moved again for JMOL.  (<u>Id.</u>

17  at 1947:22-23.)  The Court denied both parties' motions for JMOL as to bad faith, finding

18  that a jury could find for either party based on the evidence presented.  (<u>Id.</u> at 1947:24 -

19  1948:9.)

20      In their Renewed Motion for JMOL on bad faith, Defendants reiterate their prior

21  arguments without further briefing.  (Mot. for JMOL at 2; Mem. in Supp. of Mot. for JMOL

22  at 1, n. 2.)

23      In Arizona, the inquiry in bad faith cases "is whether there is sufficient evidence from

24  which reasonable jurors could conclude that in the investigation, evaluation, and processing

25  of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that

26  its conduct was unreasonable."  <u>Zilisch v. State Farm Mut. Auto. Ins. Co.</u>, 995 P.2d 276, 280

27  (Ariz. 2000) (citing <u>Noble v. Nat'l Am. Life Ins. Co.</u>, 624 P.2d 866, 868 (Ariz. 1981)).  Thus,

28

1 the test for bad faith liability is two-pronged, with the first prong being an objective

2 assessment of the insurer's actions and the second prong being a subjective look at whether

3 the insurer knew or was conscious of its unreasonable conduct.

4   Defendants contend that they had legitimate concerns regarding whether Plaintiff was

5 receiving appropriate care as required under his policy because, *inter alia*, Plaintiff misled

6 his doctors and went against their recommendations of abstinence when he enrolled in a

7 methadone clinic and because Plaintiff's treatment lacked direction and supervision.

8 Defendants also argue they had legitimate concerns about whether Plaintiff had made a

9 choice that he simply did not want to return to dentistry.  (Id. at 1421:9-15.)

10   In support of that argument, Defendants offered the testimony of Dr. Brown,

11 Defendants' lead medical director for psychiatry, and the records of physicians who evaluated

12 Plaintiff and indicated that elements of personal choice and motivation affected Plaintiff's

13 treatment and prognosis.  The evidence showed that Dr. Brown requested independent

14 medical examinations ("IMEs") by Dr. Stonnington and Dr. Obitz.  After Dr. Stonnington's

15 and Dr. Obitz' initial reports to Dr. Brown, Dr. Brown wrote them and telephoned them.

16 Plaintiff argued that Dr. Brown provided the examiners with a "slanted" synopsis of

17 Plaintiff's treatment history, and that Dr. Brown pressured Dr. Stonnington and Dr. Obitz

18 about their conclusions.  Defendants countered that those communications were to follow-up

19 and to clarify the situation, and further emphasized that neither doctor felt pressured to

20 change their opinions.

21   Plaintiff further argued that every doctor who treated or evaluated Plaintiff opined that

22 Plaintiff was receiving appropriate care.  Plaintiff pointed to the reports of Dr. Stonnington

23 and Dr. Obitz, and contended that Dr. Brown followed up with those examiners only after

24 he did not receive a response supporting termination of Plaintiff's benefits.  Plaintiff argued

25 that only after further prodding did Dr. Brown finally elicit statements from those examiners

26 that Defendants were seeking.

27

28

1    In their Motion for JMOL, Defendants contend that Plaintiff's claim was never

2  actually closed, despite Ms. Conrad's December 2001 letter to Plaintiff which read in part

3  "We regret to inform you . . . you do not qualify for continuing Total Disability benefits

4  under the terms of your policy," and despite the PACE computer system showing that

5  Plaintiff's claim was closed for benefits and the reserves associated with the claim had been

6  released.

7    At trial, each side presented its position on whether the claim was actually closed.

8  Ms. Conrad explained her December 4, 2001 letter as being "poorly worded" and not clearly

9  explaining what she meant. (Id. at 754:7-8.) She further testified that she did not take certain

10  actions that she customarily takes when closing a claim, such as placing a telephone call to

11  the insured and including appeal language in the letter. (Id. at 766:3-767:11.) Ms. Conrad

12  testified that "[t]he claim was closed in the payment system" but that "we [Defendants] didn't

13  close the handling of his claim." (Tr. 739:7-8, 740:3.) To support their contention that

14  Plaintiff's claim was not closed, Defendants emphasized that the letter provided for six

15  months' payment and offered further treatment, and that Plaintiff never stopped receiving

16  benefits. (Id. at 1239:2-5, 1240:17-1241:21.)

17    Plaintiff, however, argued that the letter meant what it said – that Plaintiff no longer

18  qualified for benefits and would no longer receive payment – and that PACE reflected that

19  fact because it showed the reserves relating to Plaintiff's claim were released in December

20  2001. (See, e.g., id. at 2026:21-25.) Plaintiff further suggested that Defendants resumed

21  paying Plaintiff benefits only after Plaintiff filed this lawsuit. (See id. at 2128:7-13.)

22  Finally, Plaintiff pointed to a referral from Ms. Conrad to Mr. Johnson before the letter was

23  sent which said in part "recommend close claim for benefits" to which Mr. Johnson annotated

24  "Agreed." (Id. at 670: 6-18.)

25    Plaintiff also offered a large amount of evidence about Defendants' claim handling

26  practices and the history of the specific type of disability insurance covered by Defendants

27  in this case. First, Plaintiff's expert, Ms. Fuller, testified that Defendants underpriced

28

disability insurance geared towards certain professions, such as medicine and dentistry, in their efforts to gain market share.  (Id. at 145:18-19, 147:3-16.)  Ms. Fuller testified that as time progressed, Defendants began losing considerable money on those policies, because the insureds were getting older and because the policies were poorly underwritten, too liberal, and could not be canceled by Defendants.  (Id. at 148:23-149:1, 149:10, 150:6-8; see Ex. 22.)  She further testified that, in response to financial losses they were suffering, Defendants stopped selling those policies and set goals for terminating claims.  (Id. at 148:14-24; see, e.g., Ex. 46, Internal Mem. ("We continue to improve the termination level and have a good chance of meeting our goal of $132 million of terminations for the quarter.") and Ex. 42, Internal Mem. ("As a result of the claim initiatives undertaken and special efforts such as the Legal Review sessions, terminations should be much stronger in the 2nd quarter.")).

Ms. Fuller described various methods utilized by Defendants to meet those goals.  Ms. Fuller testified, and Plaintiff offered documentary evidence of, Defendants' targeting of psychiatric claims because of the "gray area" and subjectivity involved in assessing those claims.  (See Ex. 27, Internal Mem. stating "since there is a larger 'gray' area in psych claims, there is a greater chance of some type of resolution.").  In addition, each claim representative drafted a "Top 10" list "of ten claimants where intensive effort will lead to successful resolution of the claim."  (Ex. 135.)  Plaintiff also offered several witnesses who discussed another of Defendants' practices, roundtable reviews.   At a roundtable review, claim representatives, lawyers, physicians, and management would address individual claims and how to resolve them.  Plaintiff offered the testimony of a former employee of Defendants' who stated that the purpose of roundtables was to terminate claims.  (Tr. 1041:19-1042:11.)  Further evidence showed that roundtable reviews (also called "legal review meetings") were considered by Defendants to be "worthwhile" because they resulted in closing claims.  (Ex. 46.)  Plaintiff's claim was roundtabled on April 26, 2001, where it was decided that Plaintiff would be examined by two independent medical examiners. Plaintiff argued that as a result of the efforts sparked by the April 2001 roundtable, Plaintiff's claim was terminated and the

related reserves were released in December 2001 -- just in time for end-of-quarter and end-of-year financial reporting. (<u>See, e.g.</u>, Tr. 2040: 7-25.)  Defendants, however, argued that those practices did not affect the processing of Plaintiff's claim. (<u>Id.</u> at 2116:2-9.)  In support of this assertion, Defendants offered the testimony of Ms. Conrad and Mr. Johnson, who said they felt no pressure to close claims.  (<u>Id.</u> at 713:2-7, 761:2-7.)

Thus, Defendants argue in their Motion for JMOL that they acted reasonably because of their legitimate concerns concerning appropriate care and personal motivation, and that Ms. Conrad and Mr. Johnson did not possess the required mental state.  (<u>Id.</u> at 1421:11-1422:2.)  Plaintiff, on the other hand, argues Defendants did not act reasonably in their processing of the claim and that Defendants knew or were conscious of the fact that their conduct was unreasonable.

The Court, drawing all inferences in favor of Plaintiff and the jury's verdict, finds that reasonable jurors could conclude that Defendants acted unreasonably in their evaluation and processing of Plaintiff's claim.  Taking the evidence in the light most favorable to Plaintiff, the Court notes that Defendants did not notify Plaintiff that he was not receiving appropriate care before they sent him the December 2001 letter.  Instead, after roundtabling Plaintiff's claim, Defendants conducted numerous IMEs and probed the examiners' reasoning in letters and telephonically. One could reasonably infer that Defendants' conduct in this case, through Ms. Conrad, Mr. Johnson and Dr. Brown, was a result of their institutional practices to terminate claims to affect the bottom line.  <u>See</u> <u>Zilisch</u>, 995 P.2d at 280 (finding there was sufficient evidence from which a jury could find that the insurer acted unreasonably and knew it, in part due to "evidence that [the insurer] set arbitrary goals for the reduction of claims paid").

The jury heard days of testimony regarding the care Plaintiff received, Defendants' institutional practices, and the circumstances surrounding the alleged closure of Plaintiff's claim, including the December 2001 letter and the PACE system.  After weighing the evidence and assessing the credibility of the witnesses, the jury rendered their clear verdict

1   in favor of Plaintiff.  Because the Court finds a legally sufficient basis for a jury to find for

2   Plaintiff, the Court will not disturb the jury's conclusion.  Accordingly, the bad faith portion

3   of Defendants' Rule 50(b) Motion will be denied.

4                        b.  Punitive damages

5        Defendants also moved for judgment as a matter of law on the issue of punitive

6   damages at the close of Plaintiff's case-in-chief. (Tr. 1420: 16-19, 1948: 16-19.) The Court

7   took that motion under advisement and allowed the punitive damages question to go to the

8   jury. (Id. at 1971:1-9.) Defendants renewed their Motion, which has now been fully briefed.

9        In Arizona, "punitive damages are recoverable in a bad faith action when the

10  defendant's conduct is 'aggravated, outrageous, malicious or fraudulent' combined with an

11  evil mind as evidenced by a showing that the defendant was consciously aware of the needs

12  and rights of the insured and nevertheless, ignored its obligations." Linthicum v. Nationwide

13  Life Ins. Co., 723 P.2d 675, 681 (Ariz. 1986) (citing Rawlings v. Apodaca, 726 P.2d 565,

14  578 (Ariz. 1986)).  Plaintiff must not only show that Defendant acted in bad faith; there must

15  be "something more than the conduct required to establish the tort" of bad faith.  Id.  Thus,

16  in addition to bad faith, "[P]laintiff must also show that the evil hand that unjustifiably

17  damaged the objectives sought to be reached by the insurance contract was guided by an evil

18  mind which either consciously sought to damage the insured or acted intentionally, knowing

19  that its conduct was likely to cause unjustified, significant damage to the insured." Rawlings,

20  726 P.2d at 578.  Plaintiff must meet this standard by clear and convincing evidence, not

21  simply by a preponderance of the evidence as required for tort liability.  Linthicum, 723 P.2d

22  at 681.

23       An "evil mind" may be demonstrated in a number of ways.  For instance, a defendant

24  possesses an evil mind through "deliberate, overt and dishonest dealings" such as a "willful

25  and knowing failure to process or pay a claim known to be valid," Farr v. Transamerica

26  Occidental Life Ins. Co., 699 P.2d 376, 383 (Ariz. Ct. App. 1984).  Also, an evil mind is

27  shown if the facts are those "from which the jury can conclude that even though defendant

28                                    - 9 -

1    had neither desire nor motive to injure (i.e., neither intent nor spite), he acted to serve his

2    own interests, having reason to know and consciously disregarding a substantial risk that his

3    conduct might significantly injure the rights of others." Bradshaw v. State Farm Mut. Auto.

4    Ins. Co., 758 P.2d 1313, 1324 (Ariz. 1988) (citing Gurule v. Illinois Mut. Life & Cas. Co.,

5    734 P.2d 85, 87 (Ariz. 1987); Rawlings, 726 P.2d at 578-79; and Linthicum, 723 P.2d at 679-

6    80) (applying bad faith case law and principles to the tort of malicious prosecution).  Indeed,

7    "punitive damages may be assessed even though the injury to the individual plaintiff was

8    'relatively small and innocuous,' so long as the cumulative harm suffered by all victims,

9    plaintiffs and non-plaintiffs, is significant, large, or 'tremendous.'" Bradshaw, 758 P.2d at

10   1324 (citing Volz v. Coleman Co., 748 P.2d 1191, 1194 (Ariz. 1987); and Hawkins v.

11   Allstate Ins. Co., 733 P.2d 1073, 1085 (Ariz. 1987)).

12       Defendants argue in their JMOL on punitive damages that it made no economic sense

13   to deny the claim to harm Plaintiff, when any relapse would exacerbate Plaintiff's condition

14   and thus entitle him to benefits again.  (Reply in Supp. of Mot. for JMOL at 1-2.)

15   Defendants also contend that no nexus exists between high-level Provident memoranda and

16   documents, which pertained to claim termination ratios and the like, and how Plaintiff's

17   particular claim was handled.  (Mem. in Supp. of Mot. for JMOL at 6-7.)   Finally,

18   Defendants maintain that Plaintiff was not harmed by any attempts by Ms. Conrad and Mr.

19   Johnson to conceal whether they closed Plaintiff's claim.  (Id. at 7-9.)

20       Plaintiff, however, counters that numerous pieces of evidence support punitive

21   damages in this case.  First, Plaintiff contends that Defendants denied his claim pursuant to

22   a pattern of unfair practices towards their insureds, thus engaging in "aggravated, outrageous,

23   malicious or fraudulent conduct."  (Resp. to Mem. in Supp. of Mot. for JMOL at 11.)

24   Defendants targeted his claim, Plaintiff argues, because it was a psychiatric claim that

25   involved a large sum of money.  (Id. at 11, 13.)  Though lower-level employees may not have

26   known of upper-level memoranda about claims-closing strategies, they were pressured to

27   meet claim termination goals.  (Id. at 13.)  In addition, Plaintiff argues that Defendants knew

28                                              - 10 -

1    when they sent Plaintiff the December 2001 letter that depriving him of his benefits would

2    likely cause a relapse, which could cause serious bodily harm or even suicide.  (Id. at 11-13.)

3    Finally, Plaintiff contends that Defendants' cover-up of whether the claim was actually closed

4    occurred in tandem with their wrongful conduct, and therefore Defendants' litigation conduct

5    may also be considered in the punitive damages inquiry.  (Id. at 14.)

6         The Court must uphold the jury's verdict "if it is supported by substantial evidence."

7    Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001) (citing

8    Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999)).  Substantial evidence

9    is defined as "evidence adequate to support the jury's conclusion, even if it is also possible

10   to draw a contrary conclusion from the same evidence."  Id.  Moreover, the Court "may not

11   substitute its view of the evidence for that of the jury."  Id.  The Court must not engage in

12   "improper usurpation of the jury's basic factfinding authority, including the authority to draw

13   inferences from the facts established and to believe some witnesses but not others."  Id. at

14   1229.

15        Here, the jury heard days of evidence and testimony concerning Plaintiff, the

16   treatment Plaintiff received, Defendants' claim-closing strategies, and how Defendants

17   handled Plaintiff's claim in particular, including the circumstances surrounding the

18   independent medical examinations, the December 2001 letter, and the PACE computer

19   system.  The Court provided the jury with clear instructions that adequately stated the law

20   and how to apply the facts, which were in great dispute, to the law.  The Court cannot and

21   will not parse out, or even attempt to speculate, as to which theory or theories of punitive

22   damages liability the jury adopted or to which piece or pieces of evidence the jury gave more

23   or less weight.  Instead, the Court concludes that evidence adequate to support the jury's

24   award of punitive damages exists based on the evidence presented at trial.

25        Reasonable jurors could infer from the testimony and evidence that Dr. Brown

26   misrepresented Plaintiff's medical treatment in his contact with independent medical

27   examiners (i.e., focusing only on the negative aspects of Plaintiff's treatment and omitting

28

the positive aspects).  In addition, a reasonable juror could conclude that Ms. Conrad and Mr. Johnson's testimony about whether or not they entirely closed the claim, together with the unambiguous language of the December 2001 letter and the PACE screens which show the claim was indeed closed, demonstrated that Defendants intentionally closed the claim and disregarded the risk that Plaintiff's rights would be injured.[1]  Also, Plaintiff proffered documentary evidence of Defendants' goals for terminating claims and their claim-closing strategies, as well as evidence that at least one of those strategies (the roundtable review) was used in Plaintiff's claim.  From that clear and convincing evidence, a reasonable juror could conclude that Defendants targeted Plaintiff's claim for closure in their own self-interest of profitability, and therefore that punitive damages are warranted.  See Bradshaw, 758 P.2d at 1324.

It is clear from the jury's verdict that Plaintiff successfully demonstrated that Defendants knew or had reason to know and consciously disregarded a substantial risk that their conduct might significantly injure Plaintiff's rights.  See id.  "Although the evidence was far from overwhelming, and the jury was not compelled to conclude that" Defendants acted with an evil mind, "neither can it be said that the jury's conclusion to that effect was unsupported by substantial evidence."  See Johnson, 251 F.3d at 1229.  Because clear and convincing evidence exists on the Record from which a reasonable jury could award punitive damages under the standards set by Arizona law discussed *supra*, the Court will

---

[1]Defendants argue that whether Ms. Conrad and Mr. Johnson lied to cover up their conduct cannot be a basis for punitive damages because their conduct did not harm Plaintiff and because that conduct did not occur in tandem with the conduct giving rise to Plaintiff's injury.  The Court first notes that it is unknown whether the jury based any part of their punitive damages liability on a "cover-up" by Ms. Johnson and Mr. Conrad.  Rather, the jury could simply have deemed Ms. Johnson and Mr. Conrad not credible and left it at that.  However, the Court finds that efforts to conceal their actions occurred in tandem with the conduct, and that a reasonable juror could construe those efforts as an attempt to avoid further liability, which in turn harmed Plaintiff.

- 12 -

1   deny the punitive damages portion of Defendants' renewed Motion for Judgment as a Matter

2   of Law.

3       **3.** *Conclusion on JMOL*

4       The Court will deny Defendants' Motion for JMOL as to both bad faith and punitive

5   damages, for it concludes that, taking the evidence in the light most favorable to Plaintiff, a

6   reasonable jury could conclude by a preponderance of the evidence that Defendants were

7   liable for bad faith and by clear and convincing evidence that Defendants were liable for

8   punitive damages.

9       Finally, because the Court denies Defendant's Motion for JMOL, the Court will also

10  deny Defendants' request for a conditional new trial under Rule 50(c)(1) of the Federal Rules

11  of Civil Procedure.

12  **B.  New Trial/Remittitur**

13      **1.** *Standard of Review*

14      When reviewing a jury's award of compensatory or punitive damages in a diversity

15  case, "the role of the district court is to determine whether the jury's verdict is within the

16  confines set by state law, and to determine, by reference to federal standards developed under

17  Rule 59, whether a new trial or remittitur should be ordered."  Browning-Ferris Indus. of

18  Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989) (regarding punitive

19  damages); Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 435 n.18 (1996)

20  (regarding compensatory damages).

21      Under Rule 59 of the Federal Rules of Civil Procedure, the Court "may grant a new

22  trial if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence

23  which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of

24  justice.'"  Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th

25  Cir. 2001) (quoting United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir. 1999));

26  see also Union Oil Co. of Cal. v. Terrible Herbst, Inc., 331 F.3d 735, 742 (9th Cir. 2003) (a

27  "trial court may grant a new trial only if the jury's verdict was against the clear weight of the

28

1   evidence").  But when a motion for a new trial is based on insufficiency of the evidence, "a

2   stringent standard applies . . . [and] a motion for a new trial may be granted on this ground

3   only if the verdict is against the great weight of the evidence or it is quite clear that the jury

4   has reached a seriously erroneous result."  Johnson, 251 F.3d at 1229 (quoting Venegas v.

5   Wagner, 831 F.2d 1514, 1519 (9th Cir. 1987)).

6          While the Court may weigh the evidence and assess the credibility of witnesses, it

7   may not grant a new trial "merely because it might have come to a different result from that

8   reached by the jury."  Roy v. Volkswagen of America, Inc., 896 F.2d 1174, 1176 (9th Cir.

9   1990) (citation omitted); see also Union Oil Co., 331 F.3d at 743 ("It is not the courts' place

10  to substitute our evaluations for those of the jurors.").  Indeed, "the trial judge does not sit

11  to approve miscarriages of justice . . ., [but] a decent respect for the collective wisdom of the

12  jury, and for the function entrusted to it in our system, certainly suggests that in most cases

13  the judge should accept the findings of the jury, regardless of his own doubts in the matter."

14  Landes Const. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987)

15  (citations omitted).

16          **2.** *Discussion*

17                  a.  Liability

18          With respect to bad faith, Defendants repeat their arguments in support of their

19  renewed Motion for JMOL and contend that the jury's finding of liability was against the

20  great weight of the evidence.  (Mem. in Supp. of Mot. for JMOL at 10.)  The Court disagrees.

21          Though the jury's verdict may not have been the same as what the Court would have

22  concluded, the Court finds sufficient evidence exists and supports the jury's verdict such that

23  a new trial on liability is not warranted.  Under Arizona law, Defendants are liable for bad

24  faith if they acted unreasonably in the investigation, evaluation, and processing of the claim,

25  and either knew or were conscious of the fact that their conduct was unreasonable.  See

26  Zilisch, 995 P.2d at 280.  At trial, Plaintiff proffered testimony and evidence regarding

27  Defendants' termination goals and ratios and their claim-closing strategies.  The evidence

28                                            - 14 -

1    showed that at least one of those strategies, the roundtable review, was conducted in

2    Plaintiff's case.  Shortly after that roundtable review, Dr. Brown contacted independent

3    medical examiners and provided information that one could reasonably conclude did not

4    provide a complete picture of Plaintiff's situation.  In addition, Plaintiff received a letter

5    which unambiguously notified him that he no longer qualified for benefits.  The author of

6    that letter recommended to her consultant that Plaintiff's claim be closed for benefits, and the

7    benefit computer system reflects that the claim was indeed closed for benefits and the

8    reserves were released.  Thus, the Court concludes that the "great weight" of the evidence

9    does not compel a new trial.  Because the evidence supports the jury's verdict and a finding

10   of liability under Zilisch, and because the jury's finding of liability was not the product of

11   passion or prejudice as discussed *infra*, the Court will deny the liability portion of the Rule

12   59 Motion for a new trial.

13                    b.  Compensatory Damages

14          The jury awarded Plaintiff $809,028.00 in future policy benefits and $4,000,000 in

15   mental, emotional, and physical pain and suffering compensatory damages.  For the reasons

16   stated just above, the Court will not grant a new trial on the imposition of compensatory

17   damages.  However, the Court now considers whether the compensatory damages awarded

18   by the jury were excessive.

19          In a diversity action, the federal court determines excessiveness by applying state law.

20   Gasperini, 518 U.S. at 426-39.  Therefore, this Court determines whether the jury's award

21   was excessive by applying Arizona law.  In Arizona, a court may not disturb a jury's damage

22   verdict "unless it finds the amount so unreasonable that it 'shocks the conscience' of the

23   court" and the verdict is "the result of passion and prejudice."  Sheppard v. Crow-Barker Paul

24   No. 1 Ltd. P'ship, 968 P.2d 612, 622 (Ariz. Ct. App. 1998) (citation omitted).  A verdict is

25   the product of passion and prejudice if it is not "within the range of credible evidence."  See

26   Flieger v. Reeb, 583 P.2d 1351, 1353 (Ariz. Ct. App. 1978); see also Bahman v. Estes

27   Homes, 710 P.2d 1087, 1090 (Ariz. Ct. App. 1985).

28

1    Defendants argue that the jury's $4 million award shocks the conscience and that
2    Plaintiff only suffered temporary emotional distress about finances. (Mem. in Supp. of Mot.
3    for JMOL at 10-12.) Plaintiff counters that he suffered physical injury when he broke his
4    own hand to obtain prescription drugs, he relapsed, and Defendants' conduct caused major
5    upheaval in his life when they sent him the December 2001 letter stating that he would no
6    longer receive benefits. (Resp. to Mot. for JMOL at 7-8.) Also, Plaintiff contends that he
7    could not be sure that Defendants would not attempt to terminate his benefits again in the
8    same fashion that they did in December 2001. (Id. at 9.)

9    The Court, however, finds the jury's award of $4 million for emotional, mental and
10   physical pain and suffering excessive. Here, Plaintiff suffered one slight physical injury, a
11   broken hand, and he relapsed. Plaintiff himself testified at trial that his self-induced hand
12   injury was "slight" and "certainly nothing that would require treatment in any way." (Tr.
13   1125: 7-8.) In addition, his relapse lasted from January to March of 2002. (Id. at 5-24.)
14   With regard to his financial situation, he did not miss a payment of benefits, although it is
15   questionable whether benefits would have begun in June 2002 but for him filing this lawsuit
16   in early March 2002. After the December 2001 letter, Plaintiff worried about his finances
17   and moved into an apartment to save money. (Id. at 1124: 19-24.) In addition, Plaintiff
18   continued to worry about whether Defendants would arbitrarily discontinue benefits again
19   after his claim was re-opened. (Id. at 1128:25-1129:10.)

20   Taking the totality of those injuries, the Court concludes that $4 million to compensate
21   for Plaintiff's "slight" physical injury, relapse, and mental and emotional distress caused by
22   worrying about his financial security shocks the conscience. Therefore, a $4 million award
23   is "grossly disproportionate to the damage incurred" in this case. See Filasky v. Preferred
24   Risk Mut. Ins. Co., 734 P.2d 76, 83 (Ariz. 1987). The Court finds that, while the jury's
25   finding of liability for bad faith was not the result of passion and prejudice, the $4 million
26   compensatory award is outrageous and the product of passion and prejudice because it is not
27   "within the range of credible evidence." See Flieger, 583 P.2d at 1353. Therefore, the Court

28

must determine an appropriate amount of compensatory damages for Plaintiff's pain and suffering.

In the seminal case of State Farm Mut. Auto. Ins. Co. v. Campbell, the United States Supreme Court determined that:

> The compensatory award in [Campbell] was substantial; the Campbells were awarded *$1 million for a year and a half of emotional distress. This was a complete compensation.* The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries . . ., so the Campbells suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them. . . .

538 U.S. 408, 426 (2003) (emphasis added). Although the plaintiff in Campbell suffered no physical injury and Plaintiff in the case at bar suffered some physical injury (albeit self-induced and classified by Plaintiff himself as being "slight" and "certainly nothing that would require treatment in any way"), the Court finds the Campbell decision instructive because the damages in both cases are largely due to financially-related emotional distress.  With $1 million being a "substantial" compensatory award for emotional distress alone and Plaintiff having suffered primarily emotional distress and only a "slight" physical injury and a relapse, the Court concludes that $1.2 million adequately "redress[es] the concrete loss that the plaintiff has suffered by reason of the defendant[s'] wrongful conduct."  Id. at 416, 426. Thus, the Court will remit Plaintiff's compensatory damages for pain and suffering from $4 million to $1.2 million, unless Plaintiff chooses to have a new trial on damages in lieu of accepting the remittitur.  Plaintiff's award of $809,028 in future policy benefits remains unaffected by the Court's decision.  Plaintiff's total compensatory damages award, if accepted by Plaintiff, would therefore amount to $2,009,028.

### c.  Punitive Damages

Defendants challenge the jury's award of punitive damages on three primary grounds: (1) that the finding of punitive damage liability went against the great weight of the evidence and cannot stand; and (2) that $15 million is so excessive that it violates their due process rights; and (3) that the $15 million award was the product of passion and prejudice, such that

1  remittitur is not an adequate remedy for the excessive verdict.  The Court addresses each of

2  these arguments in turn.

3                              1.  *Punitive damages liability*

4        The Court first considers whether a new trial on the issue of punitive damages liability

5  is warranted under Rule 59.  Defendants contend that insufficient evidence exists to hold

6  them liable for punitive damages, and they reiterate the arguments presented in their Rule 50

7  Motion.  (Mem. in Supp. of Mot. for JMOL at 10.)  Under Rule 59, when a motion for a new

8  trial is based on insufficiency of the evidence, "a stringent standard applies . . . [and the

9  motion] may be granted on this ground only if the verdict is against the great weight of the

10 evidence or it is quite clear that the jury has reached a seriously erroneous result."  Johnson,

11 251 F.3d at 1229.

12       Although the Court may weigh the evidence and assess the credibility of witnesses

13 in a Rule 59 inquiry, it may not grant a new trial "merely because it might have come to a

14 different result from that reached by the jury."  Roy, 896 F.2d at 1176; see also Union Oil

15 Co., 331 F.3d at 743 ("It is not the courts' place to substitute our evaluations for those of the

16 jurors.").  Here, the Court declines to grant a new trial.  After considering the evidence

17 presented at trial, the Court concludes that awarding punitive damages was not against the

18 "great weight" of the evidence.

19       As previously described in this Order, evidence and testimony were presented at trial

20 that showed that even though Defendants may not have had neither desire nor motive to

21 injure (i.e., neither intent nor spite), "[they] acted to serve [their] own interests, having reason

22 to know and consciously disregarding a substantial risk that [their] conduct might

23 significantly injure the rights of others." Bradshaw,758 P.2d at 1324.  Various pieces of trial

24 testimony and documentary evidence, when considered in their totality, demonstrated an

25 "evil mind" as defined by Arizona law.

26       First, after assessing the credibility of witnesses and weighing the evidence, the Court

27 concludes that Ms. Conrad and Mr. Johnson intentionally closed Plaintiff's claim.  Despite

28                                      - 18 -

their testimony that they did not entirely close the claim, the unambiguous language of the December 2001 letter and the PACE screens which show the claim was indeed closed for benefits and reserves were released tell a different story. In addition, the documentary and testimonial evidence regarding Defendants' claim-termination goals and strategies was clear. Defendants instituted termination goals and used various tools to reach them, such as "top-ten" lists of high-dollar claims to terminate and roundtable reviews, and Defendants targeted psychiatric claims because of the subjectivity in assessing them. (Exs. 27, 135.) The evidence also showed that at least one of those strategies, the roundtable review, was used in Plaintiff's claim. Although Defendants make much of the testimony of Plaintiff's expert witness that roundtables could be a good thing, documentary evidence showed that Defendants called roundtables "worthwhile" because they resulted in claim closures. (Ex. 46.) Testimony by a former employee of Defendants' also indicated that roundtables were a tool used to terminate claims. (Tr. 1041:23 - 1042:11.) Furthermore, it appears Plaintiff's claim may have been targeted because of the high-dollar amount involved and because it was a psychiatric claim. Following the roundtable, independent medical examinations led to the intentional closure of Plaintiff's claim. The Court therefore concludes that punitive damages are not against the "great weight" of the evidence, even though it may not have reached the same conclusion as the jury. Accordingly, the Court will deny Defendants' request for a new trial on whether to award punitive damages. See Union Oil Co. of Cal., 331 F.3d at 742 (a "trial court may grant a new trial only if the jury's verdict was against the clear weight of the evidence").

2. *Excessiveness of the punitive damages award*

Next, the Court must determine whether the punitive damages awarded by the jury were excessive. "In reviewing an award of punitive damages, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." Browning-Ferris Indus., 492 U.S. at 279. Thus, the Court

will look to Arizona law regarding permissible punitive damages awards after considering whether the punitive damages awarded violate due process under guidelines set by the United States Supreme Court.

### i. Due process

A punitive damages award which is "grossly excessive" in relation to the goals of punishment and deterrence violates due process. See Campbell, 538 U.S. at 416-17; BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562 (1996). To determine whether punitive damages are excessive, a court should consider the size of the punitive damages award in light of three factors: (1) the "reprehensibility of the of the defendant's conduct . . . [or] the enormity of the offense," (2) the ratio of the compensatory damages to the exemplary damages, and (3) the civil or criminal penalties that could be imposed for comparable conduct. See Gore, 517 U.S. at 574-75; Campbell, 538 U.S. at 418.

### Guidepost 1: Reprehensibility of Defendants' conduct

The first, and "most important[,] indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." Gore, 517 U.S. at 575. To assess reprehensibility, the Court must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involve repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. at 576-577. The Court now considers those factors in turn to determine the degree of reprehensibility of Defendants' conduct in this case.

The Court first looks at whether the harm caused was physical or economic. As described *supra*, Plaintiff relapsed and suffered a "slight" physical injury that he described as "slight" and "certainly nothing that would require treatment in any way." (Tr. 1125:7-8.) Therefore, Plaintiff's injuries were, for the most part, due to emotional distress or economically related. This first factor therefore does not weigh in favor of reprehensibility.

1    Next, the Court considers whether Defendants' conduct demonstrated an indifference

2  or reckless disregard for the safety or health of others.  As the Court detailed in a previous

3  Order:

> Dr. Brown and other employees of Defendant Provident Life were well aware
> that Plaintiff had struggled with an addiction to Vicodin for at least three years
> before Defendants convened a Roundtable Review of Plaintiff's claim.  In
> addition, Dr. Brown was also aware that at least one of the independent
> medical examiners found, with regard to Plaintiff's case, that "there is a
> significant risk of relapse and if he did relapse it would lead to more
> depression and anxiety and inability to function generally."  Dr. Stonnington
> told this to Dr. Brown by letter dated October 11, 2001. . . . Thus, Defendants,
> primarily through Dr. Brown, had reason to know that if Plaintiff returned to
> dentistry, there was a very good chance he would relapse into drug addiction,
> and possibly sink further into depression.  Despite these risks of harm to
> Plaintiff's health and psychological well-being, Dr. Brown recommended to
> Conrad that Plaintiff could return to work following six months of aggressive
> treatment.

11  [Doc. No. 139 at 26.]  Those facts were also presented through evidence at trial.  (Tr. at

12  1483:10-23, 1504: 22 - 1505:22, Ex. 1 at 901-04, 1017-24.)

13    Defendants argue that it would have made no sense for them to send Plaintiff a letter

14  discontinuing his benefits and thereby triggering a relapse because he would have again

15  become entitled to benefits due to his relapse.  (Reply in Supp. of Mot. for JMOL at 1-2.)

16  The Court, however, finds this argument unpersuasive in light of Defendants' December 4,

17  2001 letter to Plaintiff, which stated, "While relapse is possible, that possibility does not

18  create a right to benefits under the policy."  (Ex. 1 at 1028.)  Therefore, although Plaintiff

19  was entitled to benefits in the event of a relapse, Defendants' letter could reasonably be read

20  to inform Plaintiff that if he relapsed, he would not qualify for benefits under his policy.  The

21  Court thus concludes that Defendants' conduct demonstrated an indifference or reckless

22  disregard for Plaintiff's health or safety.

23    Third, the Court considers whether the target of Defendants' conduct, Plaintiff, was

24  financially vulnerable.  Defendants argue that, for this factor to weigh towards

25  reprehensibility, Plaintiff had to be targeted because of his financial vulnerability. "The mere

26  happenstance" that Plaintiff was financially vulnerable is insufficient, according to

27  Defendants. (Mem. in Supp. of Mot. for JMOL at 16.)  However, Defendants provide no case

28

law that supports their assertion. Defendants cite Gore, but the Supreme Court in that case noted only that when "the target is financially vulnerable," a substantial penalty can be warranted. 517 U.S. at 576. The Supreme Court's language in Gore, and later in Campbell, does not require that the plaintiff be targeted specifically because of that vulnerability. Id. at 576; Campbell, 538 U.S. at 419. In addition, a review of recent Ninth Circuit case law reveals that the Ninth Circuit does not command that a plaintiff be targeted due to his financial vulnerability. See e.g., Bains LLC v. Arco Prods. Co., 405 F.3d 764, 775 (9th Cir. 2005), Hangarter v. Provident Life and Acc. Ins. Co., 373 F.3d 998, 1014 (9th Cir. 2004). Rather, the Ninth Circuit looks to whether a plaintiff was financially vulnerable when Defendants' conduct took place. See id. Therefore, contrary to Defendants' argument, Plaintiff is not required to demonstrate that he was targeted by Defendants due to his financial vulnerability. Instead, case law dictates that Plaintiff must have been financially vulnerable when the conduct occurred in order for this factor to weigh towards reprehensibility. The evidence showed, and Defendants acknowledge (Mem. in Supp. of Mot. for JMOL at 16, Reply in Supp. of Mot. for JMOL at 12), that Plaintiff was financially vulnerable. Accordingly, the Court concludes that this factor weighs in favor of reprehensibility.

The Court next determines whether Defendants' conduct involved repeated actions or was merely an isolated incident. When considering this factor, the Court looks at whether Defendants' actions in this case "formed part of a nationwide pattern of tortious conduct." Gore, 517 U.S. at 576-77; see also Campbell, 538 U.S. at 423 ("courts must ensure the conduct in question replicates the prior transgressions" towards other insureds). Indeed, after considering the evidence regarding Defendants' claim practices, the Court concludes that Defendants' actions in this case represent one instance in a company-wide, nationwide practice of claims handling. Thus, this factor weighs in favor of reprehensibility. However, the Court also notes that Defendants may not be punished for conduct outside of Arizona. Gore, 517 U.S. at 572.

1   Last, the Court considers whether the harm was the result of intentional malice,

2   trickery, or deceit, or mere accident.  It is plain to the Court that Defendants' actions were no

3   accident; Defendants intentionally sent Plaintiff the December 4, 2001 letter informing him

4   that he no longer qualified for benefits and closed his claim.  However, the Court does not

5   find that Defendants maliciously set out to harm Plaintiff.  Thus, the Court concludes that this

6   factor does not weigh in favor of reprehensibility.

7   Therefore, two of the reprehensibility factors do not weigh in favor of reprehensibility

8   and three do.  However, after considering the reprehensibility factors, the Court concludes

9   that "a more modest punishment for this reprehensible conduct [than the jury's punitive

10  damages award] could have satisfied the State's legitimate objectives" of punishment and

11  deterrence.  See Campbell, 538 U.S. at 419.

12  Guidepost 2: Ratio of compensatory to punitive damages

13  The Supreme Court has held there is no bright line beyond which punitive damages

14  may not go.  S. Union Co. v. Southwest Gas Corp., 415 F.3d 1001, 1009-10 (9th Cir. 2005)

15  (citing Campbell, 538 U.S. at 425).  However, "few awards exceeding a single-digit ratio of

16  compensatory to punitive damages, to a significant degree, will satisfy due process."

17  Campbell, 538 U.S. at 425.  Indeed, a punitive damages award of four times the amount of

18  compensatory damages borders on constitutional impropriety.  See id. (citing Pac. Mut. Life

19  Ins. Co. v. Haslip, 499 U.S. 1, 23-24 (1991) and Gore, 517 U.S. at 581).  In Campbell, the

20  Court pointed to "a long legislative history, dating back over 700 years and going forward

21  to today, providing for sanctions of double, treble, or quadruple damages to deter and

22  punish."  538 U.S. at 425 (citing Gore, 517 U.S. at 581, and n.33).  These ratios "are

23  instructive," and "[s]ingle-digit multipliers are more likely to comport with due process,

24  while still achieving the State's goals of deterrence and retribution."  Id.

25  Moreover, the Supreme Court noted in Campbell that "*[w]hen compensatory damages*

26  *are substantial, then a lesser ratio, perhaps only equal to compensatory damages*, can reach

27  the outermost limit of the due process guarantee.  The precise award in any case, of course,

must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."  Id.  As discussed, *supra*, the Plaintiff's compensatory damages, remitted to $1.2 million plus $809,028 in future policy benefits, are substantial.  See id. at 426 (finding that compensatory award of $1 million for a year and a half of emotional distress was "substantial").

With this Court having remitted Plaintiff's compensatory damages for pain and suffering to $1.2 million, the jury's $15 million punitive damages award -- a 15-to-1 ratio -- cannot stand under the Due Process Clause of the Fourteenth Amendment.  Id.; Baker v. Hazelwood (In re Exxon Valdez), 270 F.3d 1215, 1228-31, 1238-46 (9th Cir. 2001) (12-to-1 ratio of punitive damages to compensatory damages is too excessive to withstand constitutional scrutiny).  Instead, the Court must remit the punitive damages to a single-digit ratio to comport with due process.  See Campbell, 538 U.S. at 425.  In light of the Supreme Court's "admonitions and suggested boundaries" in Campbell, see S. Union Co., 415 F.3d at 1010, the Court concludes that a punitive damages ratio of 1.5-to-1 is reasonable, appropriate, and satisfies due process.

### Guidepost 3: Comparable civil and criminal penalties

The last, and least important, of the Gore guideposts is the disparity between the punitive damages award and the civil and/or criminal penalties that could be imposed for comparable conduct.  Campbell, 538 U.S. at 428.  In this case, both sides agree that the applicable civil penalties are found in A.R.S. § 20-220, and A.R.S. § 20-456 could possibly apply also.  Each of those statutes contains a maximum penalty of $5,000 for each intentional violation of state insurance laws, capped at $50,000 within a six-month period.  A.R.S. §§ 20-220(B)(2), 20-456(B).  Thus, the punitive damages awarded by the jury far exceed the maximum penalties under Arizona's statutes.

Plaintiff also argues, however, that Defendants could have lost their Arizona insurance license under A.R.S. § 20-220(A)(1) and (4), thereby "costing Defendants hundreds of millions of dollars."  (Resp. to Mem. in Supp. of Mot. for JMOL at 20.)  From what source

1  Plaintiff derived the "hundreds of millions of dollars" figure is unclear.  Moreover, the

2  Supreme Court has found that a loss of license argument based on references to a "broad

3  fraudulent scheme drawn from evidence of out-of-state and dissimilar conduct" fails.

4  <u>Campbell</u>, 538 U.S. at 428.  The Court finds that analysis applicable here and will likewise

5  reject Plaintiff's argument regarding loss of license.  The Court concludes that the penalties

6  afforded by Arizona law are far less than the jury's punitive damages award in this case.

7  ii.  Arizona law

8  In addition to the federal guideposts, Arizona courts have established factors to

9  consider when conducting a post-verdict review of a punitive damages award.  The Arizona

10  criteria are:

11  (1) the proportionality of the award to the wrongdoer's financial
    position to ensure that the goals of punishment and deterrence are
12  served without financially devastating the defendant; (2) the
    reprehensibility of the defendant's conduct, including the duration of
13  the misconduct, the defendant's awareness of the risk of harm, and any
    concealment; and (3) the profitability to the defendant of the wrongful
14  conduct.

15  <u>Hilgeman v. Am. Mortgage Sec., Inc.</u>, 994 P.2d 1030, 1037-38 (Ariz. App. 2000) (citing

16  <u>Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn</u>, 907 P.2d 506, 520 (Ariz. 1995)).

17  The Court now examines those three Arizona factors.

18  First, the Court considers the proportionality of the jury's punitive damages verdict

19  to Defendants' financial position to ensure that the goals of punishment and deterrence are

20  served without financially devastating Defendants.  Though a higher punitive damages award

21  is needed to punish a wealthy defendant, "the award must not financially kill the defendant."

22  <u>Hawkins</u>, 733 P.2d 1073, 1084 (Ariz. 1987).  Defendants reported over $8 billion in assets,

23  $1.3 billion in surplus funds, and net income of $329 million.  (Ex. 5.)  The jury's punitive

24  damages award of $15 million therefore represents 16½ days' net income or less than 1% of

25

26

27

28

Defendants' total assets.  Therefore, the Court determines that the jury's verdict would not "financially kill" Defendants.[2]

Next, the Court examines the reprehensibility of Defendants' conduct, including the duration of the misconduct, Defendants' awareness of the risk of harm, and any concealment. The Court previously discussed reprehensibility in this Order, *supra*, but notes here that Defendants' misconduct towards Plaintiff lasted a relatively short period of time.  However, the claim practices Defendants utilized in Plaintiff's case were employed on a broader scale for a longer amount of time.[3]  As stated previously, the Court concludes that Defendants were aware of Plaintiff's risk of relapse but acted regardless.  Last, apart from some of Defendants' employees who may not have been completely forthcoming throughout the course of this litigation, the Court does not find concealment of the harm occurred in this case.

Finally, the Court considers the profitability to Defendants of their wrongful conduct. By closing claims, Defendants release the reserves held for those claims, thus reducing their liabilities.  However, the Court does not have hard numbers as to how much Defendants profited from that practice.  The Court is therefore unable to fully evaluate this factor.  The Court notes, though, that Defendants released $380,895.00 in reserves when Plaintiff's claim was terminated.  (Ex. 373)

iii.  Conclusion on excessiveness

After considering the Record in this case and engaging in the multi-factor analysis required by federal and state law, the Court concludes that a $15 million punitive damages award is excessive and disproportionate to the wrong committed.  Although Defendants' conduct was surely reprehensible, the Court concludes a more modest award would adequately serve the goals of punishment and deterrence.  Furthermore, the jury's punitive

---

[2]Additionally, the court notes that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award."  Campbell, 538 U.S. at 427.

[3]As the Court acknowledged earlier in this Order, Defendants may not be punished for conduct occurring outside of Arizona.  Gore, 517 U.S. at 572.

1    damages award (when compared with the Court's remitted compensatory damages award)

2    far exceeds the constitutional parameters suggested by the Supreme Court, and the Court

3    concludes that a 1.5-to-1 ratio is constitutionally sound and appropriate in this case.  Thus,

4    in light of the above analysis and this Court's previous determination that $1.2 million in

5    compensatory damages is sufficient, the Court will remit the punitive damages from $15

6    million to $3 million.

7         In order to preserve Plaintiff's Seventh Amendment jury rights, the court will not order

8    a remittitur without also offering the option of a new trial.  See, e.g., Morgan v. Woessner,

9    997 F.2d 1244, 1258-59 (9th Cir. 1993); see also Denholm v. Houghton Mifflin Co., 912

10   F.2d 357, 361 n.5 (9th Cir. 1990) ("the permissibility of the 'either remittitur or new trial'

11   decision has been uniformly accepted").  Thus, the Court will offer Plaintiff a choice between

12   a new trial on damages or accepting a remittitur of the punitive damages award.  Plaintiff

13   shall have until June 26, 2006, to notify the Court of his choice to either accept the remittitur

14   or proceed with a new trial on the issue of damages.

15        d.  Passion and prejudice

16        Defendants also contend that remittitur is not an adequate remedy because both

17   damage awards are the result of passion and prejudice.  (Mem. in Supp. of Mot. for JMOL

18   at 22.)  Defendants base their argument on three grounds, which the Court addresses in turn.

19        First, Defendants argue that "the enormity of both the emotional-distress award and

20   the punitive award, and the fact that the jury awarded five times the emotional-distress

21   damages suggested by [Plaintiff's] counsel, suggest that the jury was animated by passion and

22   prejudice."  (Id.)  The Court notes that Defendants' interpretation of what Plaintiff's counsel

23   suggested as a measure of damages is incorrect.  In his closing argument, counsel for Plaintiff

24   stated that "this kind of emotional trauma which something like this causes is worth *at least*

25   *as much as* the benefits they're seeking to cheat him out of."  (Tr. 2049:15-18.) (emphasis

26   added)  Therefore, Plaintiff's counsel requested at least $809,028, not exactly $809,028.

27   Moreover, the Court notes that, contrary to Defendants' argument, the size of an award alone

28

1   does not demonstrate that the jury acted with passion or prejudice.  Hawkins, 733 P.2d at

2   1084.  Thus, Defendants' first argument that remittitur is inadequate because of passion and

3   prejudice fails.

4           Second, Defendants contend that the "bad company" evidence had the capacity to

5   instruct the jury from its proper tasks of determining whether they acted in bad faith and, if

6   so, setting an appropriate amount of damages.  (Mem. in Supp. of Mot. for JMOL at 22.)

7   The Court disagrees with Defendants.  After allowing both sides to express their views on

8   the matter of whether to allow the "bad company" evidence, the Court admitted the evidence

9   over Defendants' objections because it was relevant and its probative value was not

10  substantially outweighed by prejudicial concerns.  See FED. R. EVID. 402, 403; Hangarter,

11  373 F.3d at 1019-20 (9th Cir. 2004) (affirming the admissibility of evidence regarding

12  insurance company's claims handling practices when certain of those practices was used in

13  processing the claim at issue).

14          Third, Defendants contend that improper statements made by Plaintiff's counsel during

15  final summation warrant a new trial.  (Mem. in Supp. of Mot. for JMOL at 22.)  In such a

16  situation, "[t]he question [for the Court] is whether counsel's misconduct so permeated the

17  trial as to lead to the conclusion the jury was necessarily influenced by passion and prejudice

18  in reaching its verdict."  Cooper v. Firestone Tire and Rubber Co., 945 F.2d 1103, 1107 (9th

19  Cir. 1991) (citing Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir.

20  1984)).  Applying that standard, the Court addresses the offending comments in turn.

21          Defendants first argue Plaintiff falsely implied during final summation that the jury

22  "had a unique responsibility to account for all of the insureds whose claims supposedly have

23  been wrongly denied over the years."  (Reply in Supp. of Mot. for JMOL at 15.)  The Court

24  disagrees.  During his closing argument, Plaintiff's counsel stated to the jury, "[Y]ou have

25  an opportunity to have heard and seen more evidence about these two companies and what

26  they're doing on these individual disability income claims than probably any jury that's gone

27  before you."  (Tr. 2005:9-13.)  This statement was not false, and it did not imply that the jury

28                                              - 28 -

1    had a chance to right all the wrongs allegedly committed by Defendants.  Additionally, when

2    Defendants moved for a mistrial due to this argument by Plaintiff, the Court denied the

3    motion and instead instructed the jury as follows in response to Defendants' concerns:

> In determining the amount of punitive damages, if any, that is necessary for punishment and deterrence, you may consider only the defendants' wrongful conduct that has had an impact on the citizens of Arizona.  You may not award any punitive damages for the purposes of punishing the defendants for their handling of insurance claims made by citizens of other states, or for the purpose of punishing and deterring the defendants' conduct outside the State of Arizona.
>
> Now, you recall that during the testimony people referred to other lawsuits in different other jurisdictions.  Now, there's been testimony and other testimony that has been received here, but you must judge the case solely on the facts here and only as it relates to he conduct here in Arizona and before this court.

10   (Tr. 2164:8-21.)  Thus, the Court concludes that Defendants' contention did not permeate the

11   trial and lead to an impassioned verdict by the jury and therefore the contention does not

12   constitute grounds for a new trial.

13   Defendants also argue that Plaintiff's counsel personally attacked defense attorney

14   Bressler "for presenting a defense."  (Mem. in Supp. of Mot. for JMOL at 2.)  Plaintiff's

15   counsel said the following:

> I'm sure everybody will recall it, where Mr. Bressler had asked him the question about: And really, what you wanted to do was go to France?  Now, that was a mistake on Mr. Bressler's part.  He misread a document.  It said "finance."  Can happen to anybody.  But it illustrates what's going on on their side of the room.  And that is, you subpoena all the employment records, all the dental board records, all the medical records, scour each page of the document.  Anything which looks arguably like dirt, you throw it at that wall and see if it sticks.  Doesn't matter if it fits in the context of the story or not.  You don't have to analyze it, Oh, how does this play into all this?  You just throw it.  And that's what that illustrated.

21   (Tr. 2044:7-20.)  The Court does not agree with Defendants' reading of counsel's statements,

22   just as it did not agree when Defendants argued this point during its motion for a mistrial.

23   (See id. at 2145:8-24, 2152:17-22.)  As the Court found at trial, Plaintiff's statements were

24   not "outside the bounds of closing argument . . . That was argument, counsel for the other

25   side came back and argued vigorously the other side."  (Id. at 2152:18-22.)  While it may

26   have bordered on improper argument, Defendants made no objection at trial, and the

27   statements did not permeate the trial such that an impassioned verdict would result.

28

1       Next, Defendants argue that Plaintiff's counsel pointed out that some exhibits had

2   "confidential" stamps on them and said that the jury was the first to hear all of the evidence,

3   which implied that they had concealed evidence in prior cases. (Mem. in Supp. of Mot. for

4   JMOL at 22.)  The Court does not agree with Defendants' argument.  The Court notes at the

5   outset that counsel did not say that the jury was the first to hear all the evidence as

6   Defendants suggest.  Instead, counsel stated that the jury probably had more evidence before

7   it than another jury.  (Id. at 2005:4-13.)  That statement was not false.  Additionally,

8   Plaintiff's counsel's statement that some of the exhibits were stamped "confidential" was not

9   false.  The exhibits were in fact marked "confidential," and if Defendants objected to the

10  word "confidential" appearing on some exhibits, Defendants could have made that objection

11  during trial and arrangements for redaction could have possibly followed.  Defendants,

12  however, did not object or ask the Court to redact the offending "confidential" stamps on the

13  documents during the course of trial.  Instead, Defendants first argued the impropriety of

14  those exhibits during its mistrial motion.  At that time, the Court reminded the parties that

15  it was their responsibility "to make sure that the exhibits are in appropriate form."  (Id. at

16  2151:19-21.) After reviewing Plaintiff's counsel's final summation, the Court concludes that

17  counsel's statements did not imply that Defendants had concealed evidence in prior cases.

18  As discussed *infra*, the jurors were aware there were other lawsuits, and counsel's assertion

19  that this jury had more information that a previous jury was not false.  The Court further

20  concludes that the statements did not permeate the trial and lead to an impassioned verdict

21  by the jury.

22       Defendants also assert that Plaintiff's counsel, by referring to the fact that some of the

23  exhibits in this case had been used in "other cases" against Defendants, "suggest[ed] that

24  Defendants have been sued often."  (Mem. in Supp. of Mot. for JMOL at 22.)  Defendants

25  previously raised this complaint in their motion for a mistrial.  In denying that motion, the

26  Court stated, "With regard to the allegations of the other lawsuits, there was wide discussion

27  among the experts, among the lay witnesses, among a lot of people on both sides about other

28

1    lawsuits, and being sued, and the whole industry suing – being sued on these kinds of cases.

2    So I don't particularly find that too alarming." (Tr. 2151:4-9.) The Court then noted that it

3    had informed the jury that videotape depositions presented in the instant case were actually

4    from other lawsuits, and therefore the jurors "were well aware there's been other lawsuits

5    involving bad faith cases." (Id. at 2151:10-17.) After reviewing the transcripts of the entire

6    trial, the Court's position has not changed. Numerous witnesses referred to, directly or

7    indirectly, litigation and insurance companies, particularly the defendant-insurance

8    companies. Indeed, Defendants argued in their final summation that Plaintiff's expert

9    witness's "only income is from testifying against insurers, usually [Defendant]

10    Unum/Provident. You have a bad faith case against Unum/Provident, hire Mary Fuller, she's

11    your person." (Id. at 2109:6-9.) Therefore, the Court remains unpersuaded by Defendants'

12    argument, particularly in light of Defendants' own final summation which clearly implied that

13    they had previously been sued for bad faith.

14         Defendants next contend that the jury was animated by passion and prejudice because

15    Plaintiff's counsel "stated that Defendant[s'] litigation strategy was grounds for bad faith."

16    (Mem. in Supp. of Mot. for JMOL at 22.) In his closing argument, Plaintiff's counsel made,

17    in relevant part, the following statements:

18         Do you remember their cross-examination of these employees? In fact,
        I think one of them was prefaced with "Let's get you out of here quickly and
19        back to Chattanooga."
        Why were there no questions about: Ms. Conrad, explain to the jury
20        why you used the words in this letter. Explain to them why you think it was
        just a poorly worded letter.
21        Mr. Johnson, explain what you meant the first time that you were
        deposed when you said, We hadn't closed the claim. Go ahead, now's your
22        chance to explain that to the jury. No questions like that, none.
        That's our allegation, that they acted in bad faith and outrageously by
23        doing that. The people who did it were in front of you and they didn't ask a
        single question to give you – for them to give an explanation.
24    (Tr. 2043: 3-17.)

25         At first blush, the Court is uncertain to whom exactly counsel was referring when he

26    said "they acted in bad faith and outrageously" and to what conduct he was referring to in the

27    phrase "by doing that." Whether "by doing that" alludes to defense counsel's manner of

28

1    cross-examining Defendants' employees or whether it refers to the way in which Defendants'

2    employees handled Plaintiff's claim is unclear.  Counsel's next phrase "[t]he people who did

3    it were in front of you" seems to refer to Ms. Conrad and Mr. Johnson, the people who closed

4    Plaintiff's claim, and "they didn't ask a single question to give you" seems to refer to defense

5    counsel's cross-examination.  To even arrive at that reading of the statements, however, the

6    Court is engaging in speculation.  Speculation is not sufficient grounds on which to find the

7    jury's findings were tainted by passion and prejudice.  Furthermore, the Court notes that

8    defense counsel made no objection during that closing argument, and the statements did not

9    permeate the trial such that an impassioned verdict would result.  For these reasons, the Court

10    disagrees with Defendants' assertion that the statements warrant a new trial.

11         Finally, Defendants argue that the jury was tainted because Plaintiff's counsel

12    "compared Defendants to a 'snake'" during closing argument.  (Mem. in Supp. of Mot. for

13    JMOL at 22.) Counsel stated, "And if they're going to take a loss on the block of business,

14    that's the way insurance goes.  You wait now for this block, this dead block, to sort of work

15    its way through the belly of the snake." (Tr. at 2010: 9-12.) Plaintiff responds to Defendants'

16    argument that counsel "appropriately explained that an insurance company should allow an

17    unprofitable block of policies to wind its way through the system." (Resp. to Mot. for JMOL

18    at 26, n.14.)  The Court notes Defendants did not object to the statement during final

19    summation.  Moreover, the Court finds Defendants' interpretation of the statement somewhat

20    tenuous, and further concludes the statement did not permeate the trial such that an

21    impassioned verdict would result. Defendants' argument that the jury's findings were tainted

22    because of counsel's remark therefore fails.

23         Accordingly, for the reasons stated above, the Court concludes that remittitur remains

24    the appropriate remedy for the jury's excessive compensatory and punitive damages verdict.

25    **3.** *Conclusion on New Trial/Remittitur*

26         The Court therefore concludes that a new trial is not warranted under Rule 59.

27    However, the Court will grant a remittitur in this matter, given the unconstitutionally

28

1    excessive jury awards.  Plaintiff's compensatory damages for pain and suffering will be

2    remitted to $1.2 million from $3 million, and Plaintiff's punitive damages will be remitted

3    to $3 million from $15 million.  By June 26, 2006, Plaintiff must choose whether he will

4    accept the remittitur or whether a new trial on damages will be conducted.  The Court's

5    remittitur has no effect on the $809,028 in future policy benefits awarded by the jury.

6                        **III.  MOTION FOR ATTORNEYS' FEES**

7          Plaintiff moves this Court for $1 million in attorneys' fees. [Doc. No. 231] Plaintiff

8    also requested $92,407.64 in non-taxable expenses, but withdrew that request in his Reply

9    to his Motion for Attorneys' Fees.  (Reply in Supp. of Mot. for Att'ys Fees at 8.)  The Court

10   will therefore only consider the Motion for attorneys' fees.

11         Section 12-341.01 of the Arizona Revised Statutes authorizes the award of

12   "reasonable attorneys' fees" to the prevailing party[4] in any action "arising out of a contract."

13   A.R.S. § 12-341.01(A).  Insurance bad faith cases such as this are considered to be "'arising

14   out of a contract' within the meaning of section 12-341.01(A)."  Sparks v. Republic Nat'l Life

15   Ins. Co., 647 P.2d 1127, 1142 (Ariz. 1982).  An attorneys' fee award "may not exceed the

16   amount paid or agreed to be paid."  A.R.S. § 12-341.01(A).  Whether fees are actually

17   awarded and the amount to be awarded, however, lies within the discretion of the Court.

18   Associated Indem. Corp. v. Warner, 694 P.2d 1181, 1184 (Ariz. 1985) (en banc).

19   **A.  Whether Plaintiff is Entitled to Recover Attorneys' Fees**

20         To determine whether to award attorneys' fees pursuant to § 12-341.01, the Court will

21   consider the following factors, which have been delineated by the Arizona Supreme Court:

22              (1) the merits of the unsuccessful parties' claim or defense;
             (2) whether litigation could have been avoided or settled;
23              (3) whether assessing fees against the unsuccessful party would cause
                 extreme hardship;
24              (4) whether the successful party prevailed with respect to all relief
                 sought;
25              (5) the novelty of the legal issues;

26   _____

27              [4]It is undisputed that Plaintiff is the prevailing party.

28                                   - 33 -

(6) whether such claim or defense had previously been adjudicated in Arizona; and

(7) whether the award will overly deter others from bringing meritorious claims or defenses.

<u>Id.</u>  Before embarking on its analysis of the above factors, the Court notes, as a preliminary matter, that Defendants opted not to address those factors in their Response to Plaintiff's Motion for Attorneys' Fees.  Instead, Defendants simply remind the Court that the decision to award fees is discretionary, and Defendants spend the remainder of their Response discussing the amount of attorneys' fees that should be awarded. (Resp. to Mot. for Att'ys Fees.)  The Court now considers each of the seven factors on whether to award attorneys' fees.

First, the Court looks at the merits of Defendants' position throughout this case. Plaintiff contends that Defendants' defenses lacked merit because the jury did not accept any of them.  Although the Court agrees with Plaintiff that the jury did not adopt any of Defendants' defenses, the Court does not agree that Defendants completely lacked meritorious defenses.

As to the second factor, which considers whether the case could have been settled or avoided, Plaintiff asserts that Defendants "were not prepared to settle for an amount even approaching the judgment." (Mem. in Supp. of Mot. for Att'ys Fees at 3.)  Defendants counter in their Response that neither side offered to settle for an amount close to the judgment. (Resp. to Mot. for Att'ys Fees at 10.)  Indeed, Defendants contend that both sides exchanged seven-figure settlement offers but could not agree. (<u>Id.</u>)  In light of the parties' representations, the Court cannot conclude that Plaintiff's efforts were superfluous in achieving the result in this case.

Next, the Court determines whether assessing attorneys' fees against Defendants would cause them extreme hardship.  As detailed previously in this Order, Defendants' economic position is robust.  Consequently, the Court concludes that assessing fees against Defendants would not cause them hardship.

Fourth, the Court must consider whether Plaintiff prevailed with respect to all relief sought. This factor weighs in favor of awarding attorneys' fees, as the jury returned substantial verdicts for Plaintiff with respect to both compensatory and punitive damages.

As to the fifth factor, which addresses the novelty of the legal issues presented in this case, the parties differ greatly in their views. Plaintiff contends that this case involved novel legal questions, as evidenced by three motions for summary judgment and numerous motions in limine. (Mem. in Supp. of Mot. for Att'ys Fees at 4.) Defendants, on the other hand, counter that this case did not involve novel legal issues, as the motions for summary judgment were fact-intensive and the motions in limine resolved evidentiary or procedural questions. (Resp. to Mot. for Att'ys Fees at 9-10.) The Court finds that this case was not a particularly novel one, as it, for the most part, only involved typical bad faith issues.

Next, the Court looks at whether such claim or defense has previously been adjudicated in Arizona. Plaintiff argues that "Defendants' handling of [P]laintiff's disability claim had never been adjudicated in this jurisdiction." (Mem. in Supp. of Mot. for Att'ys Fees at 4.) The Court agrees with Plaintiff's assertion, but also notes that similar bad faith cases have been adjudicated in Arizona.

Finally, the Court must determine if an attorneys' fee award in this case would deter others from bringing meritorious defenses. Plaintiff contends that insurance companies are not going to stop defending bad faith claims if the Court awards attorneys' fees in this case. (Id. at 5.) Though the Court agrees with Plaintiff, the Court does not wish to deter future defendants from putting forth tenable defenses.

After considering the above factors, the Court concludes that awarding Plaintiff attorneys' fees is appropriate. The Court must now determine the amount of reasonable attorneys' fees.

## B. Amount of Plaintiff's Reasonable Attorneys' Fees

In their pleadings regarding attorneys' fees, the parties' primary dispute is whether the Court should award fees based on the contingency fee agreement or the lodestar method.

Plaintiff contends that the attorneys' fee award should be based on the contingency fee agreement, and that he is accordingly entitled to 40% of the judgment. (Id. at 5-9.) However, Plaintiff requests less than 40%; instead, he asks the Court to award him $1 million in attorneys' fees. (Mem. in Supp. of Mot. for Att'ys Fees at 2.)  How Plaintiff arrived at the figure of $1 million is not apparent from the filings.  Defendants, on the other hand, argue that the attorneys' fee award should be based on the lodestar method. (Resp. to Mot. for Att'ys Fees at 9-10.) Plaintiff counters that Defendants' contention "is simply not a correct statement of the applicable Arizona law, which allows an award of the full contingency fee." (Reply in Supp. of Mot. for Att'ys Fees at 3.)

In Arizona, even in a contingency fee case, "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Sanborn v. Brooker & Wake Prop. Mgmt., Inc., 874 P.2d 982, 987 (Ariz. Ct. App. 1994) (citing Timmons v. Tucson, 830 P.2d 871, 878 (Ariz. Ct. App. 1991)) (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1982)). "Once this 'lodestar' figure has been calculated, other factors may be considered." Sanborn & Booker, 874 P.2d at 987.  Simply granting the contingency fee amount without further analysis is improper, as evidence of reasonableness is required even in contingency fee cases. See id.  Indeed, the lodestar method is "the centerpiece of attorney's fee awards." Blanchard v. Bergeron, 489 U.S. 87, 94 (1989) (citing Hensley, 461 U.S. 424).

Determination of a reasonable attorneys' fee award is a two-step process.  First, the Court calculates the lodestar figure by multiplying the number of hours reasonably expended by a reasonable hourly rate.  Second, the Court decides whether to enhance or reduce the lodestar figure based on its evaluation of the factors enunciated in Kerr v. Screen Actors Guild, Inc., 526 F.2d 67 (9th Cir. 1975) that have not been subsumed in the calculation of the lodestar figure.  Fischer v. SJB P.D. Inc., 214 F.3d 1115, 1119 (9th Cir. 2000).

1   With that framework in mind, the Court now determines a reasonable attorneys' fee

2   award in this case.[5]

3   **1.** *Calculation of the Lodestar Figure*

4   The Court begins its analysis with a calculation of the lodestar figure. To calculate the

5   lodestar figure, the Court takes the number of hours reasonably expended and multiplies that

6   number by a reasonable hourly rate.

7   Plaintiff's counsel has submitted no information regarding their hourly rates; instead,

8   counsel provides the fee agreement, their declarations regarding contingency fee

9   arrangements,[6] and documentation of hours spent on this case by counsel and support staff.

10  Attorneys Dawson, Rosenthal, and Temple ("trial counsel") estimate the hours they and their

11  paralegals spent on this case from start to trial, and attorneys Hudson, Janitch, and Hummels

12  ("post-trial motions counsel") and their paralegals submit detailed accounts of their time

13  spent, which they recorded simultaneously as they worked.  Total estimated attorney time by

14  trial counsel is 1580.6 hours, and total estimated time spent by trial counsel's paralegals is

15  165 hours.  (Exs. G, H to Mem. in Supp. of Mot. for Att'ys Fees.)  Post-trial motions counsel

16  and their paralegals spent 383.3 hours working on this case.  (Ex. F to Mem. in Supp. of Mot.

17  _____

18  [5]Defendants argue that Plaintiff's Motion for Attorneys' Fees does not strictly
19  comply with LR Civ 54.2(d)(2) because the Motion does not include fee agreements
    between Plaintiff and each and every one of his attorneys.  Because Plaintiff's fee
20  agreement with lead counsel Dawson provides for the hiring of  additional  counsel,
    Plaintiff's counsel is in compliance with LR 54.  Also, the Court does not adopt
21  Defendants' argument that Plaintiff is non-compliant with LR 54 because he did not
    provide 'reasonableness of rate' statements for attorneys Temple and Hudson.  Because
22  Plaintiff's fee agreement was between himself and Dawson, Dawson's statement regarding
23  reasonableness suffices.

24  [6]The Court notes that Attorney Dawson's declaration at ¶1 states "I am one of the
    attorneys who represented Joanne Ceimo in this case."  (Ex. B to Mem. in Supp. of Mot.
25  for Att'ys Fees.)  Mr. Dawson's declaration does not mention Plaintiff.  Mr. Dawson
    corrected this oversight by subsequently filing a new declaration. [Doc. No. 264] Thus,
26  the Court will grant Mr. Dawson some latitude and consider Mr. Dawson's second
27  declaration, which references Plaintiff instead of Joanne Ceimo.

28

1   for Att'ys Fees.)  Therefore, all of Plaintiff's counsel and support staff spent a total of 2128.9

2   hours on this matter.  Plaintiff requests $1,000,000 in attorneys' fees.  Divided by the number

3   of hours expended in the case, the hourly rate would be $469.73 for Plaintiff's counsel and

4   paralegals.

5        Defendants counter that Plaintiff's accounts of time by trial counsel are unreliable

6   because they were not kept contemporaneously.  (Resp. to Mot. for Att'ys Fees at 6-7.)

7   Plaintiff admits that the time spent by trial counsel on the case has been reconstructed by

8   creating "a conservative estimate of time spent by reviewing pleadings, discovery,

9   correspondence, and calendars."  (Mem. in Supp. of Mot. for Att'ys Fees at 5-6.)

10        This Court cannot accept uncritically Plaintiff's counsel's representations regarding

11   their time expended in this case.  Frank Music Corp. v. Metro-Goldwyn-Mayer Inc., 886 F.2d

12   1545, 1557 (9th Cir. 1989).  After reviewing the estimate of hours spent, however, the Court

13   concludes that the total number of hours is reasonable in light of the vigorous nature of this

14   litigation.  Therefore, the Court will proceed using Plaintiff's figure of total hours, 2128.9,

15   despite the lack of contemporaneous records.  See Spain v. Valley Forge Ins. Co., 731 P.2d

16   85, 90 (Ariz. 1986) (expressing unwillingness to hold that counsel fees can never be awarded

17   to those who work on contingency basis and do not keep time records).

18        Defendants further argue that the roughly $500 per hour rate requested by Plaintiff is

19   unreasonable, and instead suggest various hourly rates for Plaintiff's counsel and paralegals,

20   depending on their respective expertise and experience.  (Resp. to Mot. for Att'ys Fees at 5-

21   6.) Plaintiff counters by pointing out that he is eligible under Arizona law for an award far

22   exceeding $1 million, and references other cases in the District of Arizona where the hourly

23   rate equaled $500.  (Reply in Supp. of Mot. for Att'ys Fees at 5-6.)  Plaintiff also argues that

24   "Defendants' proposed lodestar analysis does not work because there is no standard hourly

25   rate in the Arizona legal community that attorneys charge plaintiffs in insurance bad faith

26   lawsuits."  (Id. at 4.)  Rather, Plaintiff contends, and Defendants do not dispute, that these

27   types of lawsuits are ordinarily taken on a contingency basis.  In addition, Plaintiff notes that

28

the "base amount" he is eligible for using Defendants' suggested hourly rates is $755,247.50. (Id. at 4-5.)  Plaintiff then contends that he is entitled to a multiplier of the lodestar base amount due to his success at trial.  (Id. at 5.)

The Court concludes that the hourly rates suggested by Defendants and addressed by Plaintiff represent reasonable rates in the Arizona legal market and adequately compensate Plaintiff's counsel for their services in this case.  Thus, the Court adopts the total of those rates, $755,247.50, as the lodestar figure.  The Court now considers whether an enhancement or multiplier, as Plaintiff requests, is appropriate, using the Kerr factors.

**2.  *Consideration of the Kerr factors***

There is a "strong presumption" that the lodestar amount represents the "reasonable" fee.  Pennsylvania v. Delaware Valley Citizens' Council, 478 U.S. 546, 565 (1986).[7]  The lodestar figure should be adjusted or enhanced only in rare or exceptional circumstances, see Blum v. Stenson, 465 U.S. 886, 899-901 (1984), and a fee applicant bears "the burden of showing that 'such an adjustment is necessary to the determination of a reasonable fee.'" See id. at 898 (emphasis added).

With the lodestar figure established, the Court now considers the factors used to assess the reasonableness of an attorneys' fee award, as delineated by the Supreme Court in Blanchard v. Bergeron, 489 U.S. 87 (1989) and adopted by the Ninth Circuit in Kerr, 526 F.2d 67, and included in this District's Local Rules:

> (1) the time and labor required;
> (2) the novelty and difficulty of the questions;
> (3) the skill requisite to perform the legal service properly;

---

[7]The Court recognizes that many of the Supreme Court and Ninth Circuit cases cited deal with federal fee-shifting statutes rather than A.R.S. § 12-341.01. However, the Court finds them nonetheless applicable and instructive, as "the common denominator for the statutory awards is that the attorney fee must be 'reasonable,'" and the Arizona statute relied upon by Plaintiff dictates that the fee must be 'reasonable.'  Lange v. Penn. Mut. Life Ins. Co., 843 F.2d 1175, 1185 (9th Cir. 1988) (applying reasoning from Supreme Court cases to diversity case involving attorneys' fee award pursuant to A.R.S. § 12-341.01).

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and length of the professional relationship with the client; and

(12) awards in similar cases.

Blanchard, 489 U.S. at 93.  The Court now considers each of those factors in turn.[8]

As to the first factor, the time and labor required, the Court has discussed this in detail in the lodestar figure calculation, *supra*.  The Court concludes that the hours expended by Plaintiff's counsel and support staff were reasonable in this case, but that this factor neither enhances nor reduces the fee award.

Second, the Court looks at the novelty and difficulty of the legal issues presented in this matter.  The Court addressed this factor in its determination that attorneys' fees are warranted, *supra*, and need not discuss it further here.  Because the legal issues were not particularly novel, the Court will not enhance the award.  Likewise, because this case was not a simple one, the award will not be reduced.

The Court next considers the skill requisite to perform the legal work properly.  Although Plaintiff's counsel are experienced in insurance bad faith litigation and possess skills particular to insurance cases that ameliorate the quality of the representation, the Court is not inclined to enhance the award based on this factor.

The fourth factor is the preclusion of other employment because of this case.  The Court addressed this factor, *supra*, and will not expound on it here.  The Court concludes that this factor favors neither an enhancement nor a reduction of the award in this case.

---

[8]The Court notes that it is not required to address all of the factors, but does so in light of its "superior understanding of th[is] litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."  Jordan v. Multnomah County, 815 F.2d 1258, 1264 n.11 (9th Cir. 1987) .

1    Fifth, the Court considers the customary fee charged.  Plaintiff notes that the usual fee

2    arrangement in insurance bad faith cases is a contingency fee, and the Court does not doubt

3    that.  However, this factor does not warrant an adjustment in the lodestar figure.

4    The sixth factor is whether the fee is fixed or contingent.  The fee in this case was a

5    contingent fee, but the Court will not enhance the lodestar figure due to this factor because

6    the Supreme Court has held, after <u>Kerr</u> was decided, that enhancing a fee award because of

7    contingency is improper.  <u>See</u> <u>City of Burlington v. Dague</u>, 505 U.S. 557, 561-567 (1992)

8    (noting that "an enhancement for contingency would likely duplicate in substantial part

9    factors already subsumed in the lodestar").

10    Next, the Court looks at time limitations imposed on Plaintiff's counsel by Plaintiff

11    or other circumstances.  Because Plaintiff reports no such limitations were imposed, the

12    Court need not take this factor into account.

13    The eighth factor the Court considers is the amount involved and the results obtained.

14    Plaintiff urges the Court to apply a 1.33 multiplier to the lodestar figure based on the results

15    obtained at trial.  (Reply in Supp. of Mot. for Att'ys Fees at 5.)  The Court recognizes that the

16    degree of success obtained is "'the most critical factor' in determining the reasonableness of

17    a fee award." <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992) (quoting <u>Hensley</u>, 461 U.S. at 436).

18    Plaintiff cites <u>Hensley</u>, 461 U.S. at 435, as support for his contention that an adjustment is

19    proper based on this factor.  (Reply in Supp. of Mot. for Att'ys Fees at 5.)  However, the

20    Court notes that since <u>Hensley</u> was decided, the Supreme Court has established that the

21    lodestar figure should be adjusted or enhanced only in rare or exceptional circumstances. <u>See</u>

22    <u>Blum</u>, 465 U.S. at 899-901.  Indeed, a fee applicant bears "the burden of showing that 'such

23    an adjustment is *necessary* to the determination of a reasonable fee.'" <u>See</u> <u>id.</u> at 898

24    (emphasis added).  Additionally, the Court notes that results obtained "normally should not

25    provide an independent basis for increasing the fee award."  <u>Id.</u> at 900.

26    Plaintiff also cites <u>Guam Soc'y of Obstetricians and Gynecologists v. Ada</u>, 100 F.3d

27    691, 697 (9th Cir. 1996) to support his argument that the lodestar amount should be increased

28

1    in this case. (Reply in Supp. of Mot. for Att'ys Fees at 5.)  However, the Court finds Ada

2    distinguishable from this case.  The plaintiffs in Ada challenged Guam's anti-abortion statute,

3    and there was a great likelihood that plaintiff's counsel was the only attorney on the island

4    who would take the case.  Ada, 100 F.3d at 694, 698.  Indeed, plaintiff's counsel in Ada

5    received death threats due to her involvement in the case.  Id. at 698-99. The Court finds the

6    instant case far different from the truly rare and exceptional circumstances present in Ada.

7    The multiplier applied in Ada was based on undesirability of the case, id. at 699; here,

8    Plaintiff argues that a multiplier is appropriate due to the success achieved at trial.  Because

9    the basis for the multiplier and the circumstances in Ada are so distinguishable from those

10   present in this case, the Court concludes that Ada is not applicable.

11          Though the Court agrees with Plaintiff that the results obtained in this case were

12   impressive, the Court does not find this case is rare or exceptional, such that an enhancement

13   or multiplier is necessary to arrive at a reasonable fee for Plaintiff's counsel's services.  Thus,

14   the Court will make no adjustment to the lodestar figure based on the eighth Kerr factor.

15          Next, the Court considers the experience, reputation, and ability of Plaintiff's counsel.

16   It is undisputed that Plaintiff's counsel is sufficiently experienced, reputable, and able;

17   indeed, because this factor has been subsumed into the lodestar figure as to what is a

18   reasonable hourly rate, the Court will not enhance the award based on this factor.

19          The tenth factor is the "undesirability" of the case.  As discussed supra, Plaintiff's

20   argument for an enhancement is not based on undesirability; rather, it is based on the results

21   obtained.  However, Plaintiff contends that the case was undesirable.  Defendants counter

22   that Plaintiff's counsel specifically seeks out cases of this nature.  The Court concludes that

23   this factor does not warrant an enhancement or reduction of the lodestar figure.

24          The Court next looks at the nature and length of the professional relationship between

25   Plaintiff and Plaintiff's counsel.  It is not disputed that the relationship has only extended to

26   the case at bar.  Hence, this factor does not compel an adjustment to the fee award.

27

28

1    The final factor for the Court's consideration is awards in similar cases.  Plaintiff

2    points to two recent bad faith cases litigated in this District.  In one of those cases, the fee

3    awarded was $600,000, and in the other case, the full amount of the contingency fee as

4    applied to the compensatory damages award was awarded.  Plaintiff also cites an Arizona

5    Court of Appeals case in which the fee amounted to $1350 per hour.  The Court finds that

6    those cases are not particularly helpful, however, as their circumstances varied from those

7    in this case, and each of those cases presented specific issues that may have influenced the

8    respective court's determination.  Thus, the Court will not adjust the fee award because of

9    this factor.

10    After considering the above factors, the Court concludes that an adjustment to the

11    lodestar figure is not warranted.  The lodestar amount presumptively represents the

12    reasonable fee, and Plaintiff has not demonstrated that this case was rare or exceptional such

13    that an adjustment or multiplier is necessary to arrive at the reasonable fee award.  Therefore,

14    the Court concludes that the lodestar figure, $755,247.50, is a reasonable attorneys' fees

15    award in this case.  Plaintiff will be awarded that amount in attorneys' fees.  However,

16    because the Court does not grant Plaintiff the amount of attorneys' fees he seeks, Plaintiff's

17    Motion for Attorneys' Fees is granted in part and denied in part.

### IV. CONCLUSION

19    For the reasons set forth above,

20    **IT IS ORDERED** that Defendants' Renewed Motion for Judgment as a Matter of

21    Law or, In the Alternative, Motion for a New Trial and/or Remittitur [Doc. No. 235] is

22    **GRANTED IN PART** and **DENIED IN PART**.  Specifically, judgment as a matter of law

23    and a new trial are DENIED, and remittitur is GRANTED.

24    **IT IS FURTHER ORDERED** that Plaintiff shall have until June 26, 2006 to notify

25    the Court whether he elects to (a) accept the remittitur to a compensatory damage award of

26    $1,200,000 in pain and suffering plus $809,028 in future policy benefits, and a punitive

27

28

damage award of $3,000,000, for a total of $5,009,028 in damages, or (b) proceed to a new trial on the issue of damages.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Attorneys' Fees and Related Non-Taxable Expenses [Doc. No. 231] is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff is awarded $755,247.50  in attorneys' fees.

DATED this 26th day of May, 2006.

Stephen M. McNamee
United States District Judge